## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Case No.  **6:23CR00022** |
| | ) |
| CAROLYN BRYANT-TAYLOR, | ) **SEALED INDICTMENT** |
| KAFOMDI JOSEPHINE OKOCHA, | ) |
| SAMUEL OKOCHA, | ) In violation of: |
| SHEKITA GORE a/k/a SHEKITA STEELE, | ) 18 U.S.C. § 2 |
| BERTHE FEUZEU a/k/a BERTHE DJUNI, | ) 18 U.S.C. § 1347 |
| ANTHONY KANU, | ) 18 U.S.C. § 1349 |
| ELIZABETH ILOME, | ) 18 U.S.C. § 1512(c) |
| ENO UTUK, | ) 18 U.S.C. § 1957 |
| RHABIATU KAMARA | ) |

### INTRODUCTION

The Grand Jury charges that at all times material to this Indictment:

#### The Medicaid Program

1.  The Medical Assistance Program ("Medicaid") is a health care benefit program as defined in Title 18, United States Code, Section 24(b), that provides medical assistance to low-income individuals who meet certain eligibility requirements. Funding for Medicaid comes from both the federal government and the Commonwealth of Virginia. In Virginia, the Medicaid program is administered and supervised by the Department of Medical Assistance Services (DMAS). DMAS is responsible for payment to medical service providers for care and services received by Medicaid-eligible individuals.

2.  Medicaid has established procedures in accordance with federal regulations to compensate health care providers for services provided to Medicaid recipients. An organization can participate in the Medicaid program if it has a valid participation agreement

with Medicaid agreeing that it will: (1) provide the service, (2) submit an accurate claim, and (3) accept as payment in full the amount paid by Medicaid. Providers also agree to keep such records as are necessary to document the services provided to Medicaid recipients, and to furnish such information to Medicaid upon request; to render and perform services that are in accordance with federal and state law and applicable regulations; and to only submit to Medicaid claims that comply with Medicaid's rules and regulations.

3. Medicaid will only pay for services that are medically necessary and meet established rules and regulations. Providers are responsible for reading and adhering to the policies and regulations explained in the Medicaid provider manuals. Providers agree to only submit claims for services they actually provide to a Medicaid recipient.

Home Health Agencies

4. Home health agencies may provide private duty nursing, personal care, and respite care services, which are designed to prevent or reduce unnecessary institutional care.

5. Private duty nursing, i.e., skilled, in-home nursing care, is provided by a registered nurse (RN) or a licensed practical nurse (LPN) under the supervision of an RN. These services are rendered according to a plan of care, which enables the patient to remain at home rather than in a hospital or nursing facility.

6. Personal and respite care may be provided by aides who perform basic health-related services, to include assisting with personal hygiene, eating, walking, meal preparation, feeding, and taking and recording vital signs.

7. DMAS requires that aides record the personal and respite care services they

2

have provided, including arrival and departure times and any significant physical, social and emotional conditions of the recipient. Either the recipient or the recipient's caregiver must sign the records weekly, along with the provider. DMAS accepts the provider record as proof that services were rendered and reimburses providers for the amount of time that service was provided.

8.   An RN must supervise aides who provide personal care. When only personal care services are being furnished, an RN must make a supervisory visit to the recipient's residence at least every 90 days when an aide is furnishing care.

9.   When a recipient begins receiving private duty nursing services, an RN must perform an assessment, which must be maintained in the recipient's record throughout the duration of treatment. Nursing plans of care based on the initial admission assessment are required for all recipients and must be updated as the recipient's nursing care needs change. In addition, nursing notes describing the treatment and care provided must be completed by RNs and LPNs for private duty nursing care at the time of each visit.

10. In order to reimburse for private duty nursing services, DMAS requires a signed and dated physician order, a plan of care assessment, and documentation available for services rendered and billed, including daily nursing notes. Medicaid will not reimburse for services that are not so documented, and DMAS may recover any inappropriate payment.

11. In general, to obtain reimbursement for health care services, the provider must submit bills, or claims, to the patient's insurance carrier, referred to as a managed care organization (MCO). In some circumstances, the provider may submit claims directly to DMAS on behalf of a patient. Claims are sent electronically by wire and include the service

3

rendered and dates of service. After the claim has been processed and approved, payment for the service is sent to the provider.

1st ADULT

12. At all time relevant to the Indictment, 1st ADULT N PEDIATRIC HEALTHCARE, National Provider Identifier (NPI): 1912356098 a/k/a 1st ADULT N PEDIATRIC HEALTHCARE SERVICE; d/b/a 1st ADULT & PEDIATRIC HCS, INC., NPI: 1992367841 a/k/a 1st ADULT & PEDIATRIC HEALTHCARE SERVICES; d/b/a 1st ADULT & PEDIATRIC MEDICAL SUPPLY LLC, NPI: 1770025124 (collectively, "1st ADULT"), was enrolled with Medicaid as a home health agency providing private duty nursing, personal care, and respite care services. 1st ADULT operated throughout the Commonwealth of Virginia, including in the Western District of Virginia.

The Defendants

13. CAROLYN BRYANT-TAYLOR ("BRYANT-TAYLOR") was an owner and operator of 1st ADULT. BRYANT-TAYLOR has been identified in documents filed with the Virginia State Corporation Commission (SCC) as both Director and President of 1st ADULT. She was also identified by DMAS as the Chief Operating Officer of 1st ADULT.

14. KAFOMDI JOSEPHINE OKOCHA ("JOSEPHINE OKOCHA") was an owner and operator of 1st ADULT. JOSEPHINE OKOCHA has been identified in documents filed with the SCC as Director, Vice President, and Treasurer of 1st ADULT.

15. SAMUEL OKOCHA has been identified as an owner of 1st ADULT &

4

PEDIATRIC MEDICAL SUPPLY LLC on documents filed with DMAS. He has been further identified in documents filed with the SCC as Secretary and an Officer of 1st ADULT.

16. SHEKITA GORE a/k/a SHEKITA STEELE ("GORE") was an owner and Operator of 1st ADULT. GORE has been identified in documents filed with the SCC as Secretary and Director of 1st ADULT.

17. BERTHE FEUZEU a/k/a BERTHE DJUNI ("FEUZEU") was an LPN employed by 1st ADULT.

18. ANTHONY KANU ("KANU") was an LPN employed by 1st ADULT.

19. ELIZABETH ILOME ("ILOME") was a medication technician employed by 1st ADULT.

20. ENO UTUK ("UTUK") was an LPN employed by 1st ADULT.

21. RHABIATU KAMARA ("KAMARA") was an LPN employed by 1st ADULT.

<u>Enrollment in Medicaid</u>

22. On or about December 16, 2016, GORE, on behalf of 1st ADULT, entered into Medicaid Participation Agreements under the name 1st ADULT N PEDIATRIC HEALTHCARE SERVICE, in order to submit claims to Medicaid for providing private duty nursing, personal care and respite care services. GORE certified that she agreed, among other things, to comply with all state and federal laws and regulations as well as applicable policies and procedures of the Medicaid program.

23. On or about January 4, 2017, BRYANT-TAYLOR, on behalf of 1st ADULT,

entered into Medicaid Participation Agreements under the name 1st ADULT N

PEDIATRIC HEALTHCARE, to submit claims to Medicaid for providing home health

services and to allow 1st ADULT to participate in and provide services in connection with

Medicaid's Developmental Disability Waiver program. BRYANT-TAYLOR certified that

she agreed, among other things, to comply with all state and federal laws and regulations as

well as applicable policies and procedures of the Medicaid program.

24. On or about March 10, 2017, BRYANT-TAYLOR, on behalf of 1st ADULT,

entered into a Medicaid Participation Agreement under the name 1st ADULT &

PEDIATRIC MEDICAL SUPPLY LLC, in order to provide durable medical equipment

and submit claims to Medicaid. BRYANT-TAYLOR certified that she agreed, among other

things, to comply with all state and federal laws and regulations as well as applicable policies

and procedures of the Medicaid program.

25. On or about July 3, 2019, BRYANT-TAYLOR, on behalf of 1st ADULT, entered

into Medicaid Participation Agreements under the name 1st ADULT & PEDIATRIC

HEALTHCARE SERVICES, in order to submit claims to Medicaid for respite care, private

duty nursing, personal care and home health services. BRYANT-TAYLOR certified that she

agreed, among other things, to comply with all state and federal laws and regulations as well

as applicable policies and procedures of the Medicaid program.

## COUNT ONE
### (Conspiracy to Commit Health Care Fraud)

The Grand Jury charges that:

26. The Introduction of this Indictment alleged in paragraphs 1-25 are realleged and

incorporated by reference in their entirety as if set forth herein.

27. From in or about at least 2017 and continuing up until the date of this Indictment, in the Western District of Virginia and elsewhere, BRYANT-TAYLOR, JOSEPHINE OKOCHA, SAMUEL OKOCHA, GORE, FEUZEU, KANU, ILOME, UTUK and KAMARA did willfully and knowingly combine, conspire, confederate, and agree together and with each other and with others known and unknown to the Grand Jury to commit certain offenses against the United States, that is to knowingly and willfully execute a scheme and artifice to defraud and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, Medicaid, a health care benefit program as defined in Title 18, United States Code, Section 24(b), in connection with the delivery of, and payment for, health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

## Purpose of the Conspiracy

28. It was a purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich 1st ADULT, themselves, and others, by, among other things: (a) submitting and causing the submission of false and fraudulent claims to Medicaid for services that were not eligible for Medicaid reimbursement as submitted and that were not provided in accordance with Medicaid rules and regulations, were not provided for the number of hours or units of service claimed, and, in many instances, were not provided at all; and (b) falsifying records and documentation to support claims for reimbursement submitted to Medicaid.

## Manner and Means to Accomplish the Conspiracy

29. The manner and means by which the defendants and their co-conspirators sought to

7

accomplish the purpose of the conspiracy included the following:

    a.   Knowingly submitting and causing the submission of false claims to Medicaid, which fraudulently represented that patients had received services from 1st ADULT when no services were provided;

    b.   Knowingly submitting and causing the submission of false claims to Medicaid, which fraudulently represented that patients had received more hours or units of service from 1st ADULT than were actually provided;

    c.   Paying parents and guardians of patients to lie about services 1st ADULT was providing;

    d.   Paying parents and guardians of patients not to report information about 1st ADULT and its employees to investigators;

    e.   Telling parents and guardians of patients that they would lose Medicaid coverage if they switched home health agencies or told investigators about 1st ADULT's fraudulent practices;

    f.   Creating, attempting to create, and causing the creation of materially false records and other documents that were later used to support fraudulent claims submitted to Medicaid;

    g.   Directing parents and guardians of patients to sign blank nursing notes and patient records that were later used to support fraudulent claims submitted to Medicaid;

    h.   Failing to provide supervisory RN visits and update plans of care as required by Medicaid;

i.   Moving 1st ADULT patients to another home health agency in furtherance of

the scheme to defraud.

**Fraudulent Billing for Services Not Provided**

30. The defendants and their co-conspirators submitted and caused to be submitted

fraudulent claims to Medicaid for services 1st ADULT did not provide, including but not

limited to the following patients.

*Patient 1*

31. PATIENT 1 was authorized to receive private duty nursing care. FEUZEU was the

nurse assigned to PATIENT 1's care.  In lieu of providing care to PATIENT 1, FEUZEU

met PATIENT 1's guardian at a predetermined location. FEUZEU paid PATIENT 1's

guardian in exchange for PATIENT 1's guardian's signature on blank nursing notes.

BRYANT-TAYLOR falsely told PATIENT 1's guardian that PATIENT 1 would lose

Medicaid coverage if PATIENT 1's guardian did not sign the blank nursing notes, accept

payment, and lie about the services 1st ADULT provided to PATIENT 1. The falsified

nursing notes were used to bill Medicaid for services that 1st ADULT did not provide to

PATIENT 1.

*Patient 2*

32. PATIENT 2 was authorized to receive both private duty nursing care and personal

care. UTUK was the nurse assigned to PATIENT 2's nursing care. ILOME was the aide

assigned to PATIENT 2's personal care. In lieu of providing care to PATIENT 2, UTUK

and ILOME provided PATIENT 2's parent with blank nursing notes to sign. In exchange,

JOSEPHINE OKOCHA paid PATIENT 2's parent. JOSEPHINE OKOCHA and

BRYANT-TAYLOR falsely told PATIENT 2's parent that PATIENT 2 would lose Medicaid coverage if PATIENT 2's parent did not sign the blank nursing notes, accept payment, and lie about the services 1st ADULT provided to PATIENT 2. The falsified nursing notes were used to bill Medicaid for services that 1st ADULT did not provide to PATIENT 2.

*Patient 3*

33. PATIENT 3 was authorized to receive private duty nursing care. In lieu of providing a nurse to care for PATIENT 3, JOSEPHINE OKOCHA and BRYANT-TAYLOR gave PATIENT 3's parent blank nursing notes to sign. In exchange, JOSEPHINE OKOCHA and BRYANT-TAYLOR paid PATIENT 3's parent in cash.

34. At some point, KANU became the nurse assigned to PATIENT 3's care. In lieu of providing care to PATIENT 3, KANU provided PATIENT 3's parent with blank nursing notes to sign. In exchange, KANU paid PATIENT 3's parent. JOSEPHINE OKOCHA and BRYANT-TAYLOR instructed PATIENT 3's parent to lie to investigators about the services 1st ADULT provided to PATIENT 3. The falsified nursing notes were used to bill Medicaid for services that 1st ADULT did not provide to PATIENT 3.

*Patient 4*

35. PATIENT 4 was authorized to receive private duty nursing care. From 2020 to 2023, 1st ADULT provided no nursing care to PATIENT 4. In lieu of providing nursing care to PATIENT 4, JOSEPHINE OKOCHA paid PATIENT 4's parent. 1st ADULT submitted fraudulent claims to Medicaid for nursing services that were not provided to PATIENT 4.

*Patient 5*

36. PATIENT 5 was authorized to receive private duty nursing care. KAMARA was a nurse assigned to PATIENT 5. KAMARA provided PATIENT 5's guardian with blank nursing notes to sign. In exchange, KAMARA paid PATIENT 5's guardian. BRYANT-TAYLOR told PATIENT 5's guardian to keep the arrangement between them. The falsified nursing notes were used to bill Medicaid for services that were not provided to PATIENT 5.

*Patient 6*

37. Between approximately 2018 and 2020, 1st ADULT submitted fraudulent claims to Medicaid for services purportedly provided to PATIENT 6 during periods of time when PATIENT 6 was hospitalized and did not actually receive any services from 1st ADULT.

*Patient 7*

38. Between in or about May, 2019, and in or about July, 2019, 1st ADULT submitted fraudulent claims to Medicaid for services purportedly provided to PATIENT 7 during periods of time when PATIENT 7 did not actually receive services from 1st ADULT.

*Patient 8*

39. From in or about October, 2017, to in or about February, 2021, 1st ADULT submitted fraudulent claims to Medicaid for nursing services purportedly provided to PATIENT 8 when PATIENT 8 did not actually receive nursing services from 1st ADULT.

*Patient 9*

40. From in or about September, 2020, to in or about January, 2021, 1st ADULT submitted fraudulent claims to Medicaid for nursing services purportedly provided to PATIENT 9 when PATIENT 9 did not actually receive nursing services from 1st ADULT.

11

*Patient 10*

41. From in or about April, 2018, to February, 2023, 1st ADULT submitted fraudulent claims to Medicaid for more hours of nursing services than were actually provided to PATIENT 10.

*Patient 11*

42. From in or about June, 2018, to April, 2019, 1st ADULT submitted fraudulent claims to Medicaid for more hours of nursing services than were actually provided to PATIENT 11.

**Falsification of Records**

43. The defendants and their co-conspirators falsified, attempted to falsify, and caused to be falsified records and other documents used to support claims for reimbursement submitted to Medicaid.

44. The factual allegations alleged in Paragraphs 31-34 and 36 are realleged and incorporated by reference in their entirety as if set forth herein.

45. For example, BRYANT-TAYLOR contacted the parents of former 1st ADULT patients, PATIENT 12 and PATIENT 13, requesting to meet with them in person regarding nursing notes that she claimed required signature, more than a year after these patients stopped receiving services with 1st ADULT.

**Failure to Update Plans of Care**

46. GORE failed to provide supervisory RN visits and update plans of care as required by Medicaid.

12

### Additional Incentives Offered to Patient Families

47. BRYANT-TAYLOR, JOSEPHINE OKOCHA, and SAMUEL OKOCHA offered monetary and non-monetary incentives to parents and guardians of 1st ADULT patients to lie to investigators about their experiences with 1st ADULT.

48. For example, in 2021, BRYANT-TAYLOR went to the home of PATIENT 6 and instructed PATIENT 6's parent to tell investigators that PATIENT 6 had received all hours of care 1st ADULT had billed for, even if services were not rendered. In exchange, BRYANT-TAYLOR offered PATIENT 6's parent diapers, a hotel stay or a vacation.

49. BRYANT-TAYLOR, JOSEPHINE OKOCHA, and SAMUEL OKOCHA paid the parent of PATIENT 14 to keep quiet about incidents involving 1st ADULT nurses assigned to provide care to PATIENT 14.

50. BRYANT-TAYLOR and JOSEPHINE OKOCHA paid PARENT A and used sensitive, personal information about PARENT A to coerce PARENT A into signing blank nursing notes and lie about services provided by 1st ADULT.

### Creation of Home Health Agency 2

51. In or about 2021, BRYANT-TAYLOR and GORE began actively operating HOME HEALTH AGENCY 2 and moving 1st ADULT patients to HOME HEALTH AGENCY 2 in order to further and continue the scheme to defraud Medicaid.

52. BRYANT-TAYLOR submitted and caused to be submitted documents to the SCC for HOME HEALTH AGENCY 2, listing third parties as owners and operators of the company, in order to conceal BRYANT-TAYLOR's affiliation with HOME HEALTH AGENCY 2.

13

53. All in violation of Title 18, United States Code, § 1349.

## COUNT TWO
### (Health Care Fraud)

The Grand Jury further charges:

54. The allegations set forth in Paragraphs 1 through 25 and 28 through 52 are realleged and incorporated by reference in their entirety as if set forth herein.

55. From at least 2017 through the date of this Indictment, in the Western District of Virginia and elsewhere, BRYANT-TAYLOR, JOSEPHINE OKOCHA, SAMUEL OKOCHA, and GORE, as principals and aiders and abettors, knowingly and willfully executed and attempted to execute a scheme and artifice to defraud and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money owned by, and under the custody and control of, Medicaid, a health care benefit program as defined in Title 18, United States Code, Section 24(b), in connection with the delivery of, and payment for, health care benefits, items, and services, by causing the submission of false claim forms to Medicaid for reimbursement.

56. It was part of the scheme and artifice that the defendants regularly submitted and caused to be submitted to Medicaid fraudulent claims for services when BRYANT-TAYLOR, JOSEPHINE OKOCHA, SAMUEL OKOCHA, GORE, and others knew that such services were not actually provided.

57. It was part of the scheme and artifice that the defendants regularly submitted and caused to be submitted to Medicaid fraudulent claims for services when BRYANT-TAYLOR, JOSEPHINE OKOCHA, SAMUEL OKOCHA, GORE, and others knew that such services were not eligible for Medicaid reimbursement as submitted.

58. It was a purpose of the scheme for BRYANT-TAYLOR, JOSEPHINE

OKOCHA, SAMUEL OKOCHA, GORE, and others to unlawfully enrich and benefit 1st

ADULT and themselves.

59. BRYANT-TAYLOR, JOSEPHINE OKOCHA, SAMUEL OKOCHA, and GORE,

as principals and aiders and abettors, for the purpose of executing the scheme and artifice to

defraud, did knowingly and willfully submit and cause to be submitted fraudulent claims to

Medicaid for services allegedly provided when, in fact, as BRYANT-TAYLOR,

JOSEPHINE OKOCHA, SAMUEL OKOCHA, and GORE well knew, the services

claimed were not provided and the claims were not eligible for Medicaid reimbursement as

submitted.

60. All in violation of Title 18, United States Code, §§ 1347 and 2.

## COUNT THREE
### (Obstruction of Justice)

The Grand Jury further charges:

61. In or about February, 2021, in the Western District of Virginia and elsewhere, the

defendant, CAROLYN BRYANT-TAYLOR, did corruptly alter, destroy, mutilate, and

conceal a record and document, namely nursing notes related to services provided to

PATIENT 13, and attempted to do so, with the intent to impair its integrity and availability

for use in an official proceeding, that is, *United States ex rel. Jessica Patterson & Autumn Williams

v. 1st ADULT & Pediatrics Healthcare Services, Inc.,* Case No. 6:19cv00068 (W.D. Va.) (Moon,

J.), and did corruptly attempt to obstruct, influence, and impede said official proceeding.

62. All in violation of Title 18, United States Code, § 1512(c).

15

## COUNT FOUR
**(Obstruction of Justice)**

The Grand Jury further charges:

63. In or about March, 2021, in the Western District of Virginia and elsewhere, the defendant, CAROLYN BRYANT-TAYLOR, did corruptly alter, destroy, mutilate, and conceal a record and document, namely nursing notes related to services provided to PATIENT 12, and attempted to do so, with the intent to impair its integrity and availability for use in an official proceeding, that is, *United States ex rel. Jessica Patterson & Autumn Williams v. 1st ADULT & Pediatrics Healthcare Services, Inc.,* Case No. 6:19cv00068 (W.D. Va.) (Moon, J.), and did corruptly attempt to obstruct, influence, and impede said official proceeding.

64. All in violation of Title 18, United States Code, § 1512(c).

## COUNT FIVE
**(Money Laundering)**

The Grand Jury further charges:

65. On or about May 27, 2020, in the Western District of Virginia and elsewhere, defendant CAROLYN BRYANT-TAYLOR did knowingly engage in a monetary transaction in criminally derived property of a value greater than $10,000, and which in fact was derived from specified unlawful activity, namely, that CAROLYN BRYANT-TAYLOR withdrew cash in the amount of $75,000 from Truist Bank account ending in 6140 in the name of 1st Adult N Pediatric Healthcare Service for payment towards home purchases, which funds were in fact were derived from a scheme to defraud Medicaid, a health care benefit program as defined in Title 18, United States Code, Section 24(b), in connection with the delivery of,

and payment for, health care benefits, items, and services, in violation of Title 18, United States Code, § 1347.

66. All in violation of Title 18, United States Code, § 1957.

## COUNTS SIX THROUGH EIGHT
### (Money Laundering)

The Grand Jury further charges:

67. On or about the dates set forth below, in the Western District of Virginia and elsewhere, defendant KAFOMDI JOSEPHINE OKOCHA did knowingly engage and attempt to engage in the following monetary transactions in criminally derived property of a value greater than $10,000, and which in fact were derived from specified unlawful activity, a scheme to defraud Medicaid, a health care benefit program as defined in Title 18, United States Code, Section 24(b), in connection with the delivery of, and payment for, health care benefits, items, and services in violation of Title 18, United States Code, § 1347:

| COUNT | DATE | MONETARY TRANSACTION |
|-------|------|----------------------|
| 6 | May 15, 2020 | Check number 2041 from Truist Bank account ending in 6159 in the name of 1st Adult N Pediatric Healthcare Service in the amount of $32,000 to Samjose Global, Inc. for payment towards Carolyn Bryant-Taylor's vehicle |
| 7 | July 10, 2020 | Check number 2069 from Truist Bank account ending in 6159 in the name of 1st Adult N Pediatric Healthcare Service in the amount of $60,203.45 to pay off a loan at BB&T for a Range Rover Velar automobile |
| 8 | July 17, 2020 | Cash withdrawal from Truist Bank account ending in 6159 in the name of 1st Adult N Pediatric Healthcare Service in the amount of $121,962.75 to purchase cashier's check number 1002973453 issued to Kafomdi Okocha to be deposited into Truist account ending in 0255 in the name of Kafomdi Josephine Okocha and Samuel O. Okocha, for the purchase of a Range Rover automobile |

68. All in violation of Title 18, United States Code, § 1957.

## NOTICE OF FORFEITURE

69. Upon conviction of one or more of the felony offenses alleged in this

Indictment, defendants shall forfeit to the United States:

a. Any property, real or personal, which constitutes or is derived from proceeds traceable to said offenses, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461;

b. Any property, real or personal, involved in said offenses, or any property traceable to such property, pursuant to 18 U.S.C. § 982(a)(1);

c. Any property, real or personal, which constitutes or is derived from proceeds traceable to said offenses, pursuant to 18 U.S.C. § 982(a)(7).

70. The property to be forfeited to the United States includes but is not limited to the following property:

a. **Money Judgment**

Not less than $38,304,602 in U.S. currency and all interest and proceeds traceable thereto, in that such sum in aggregate was obtained directly or indirectly as a result of said offenses or is traceable to such property.

71. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with a third person;

c. has been placed beyond the jurisdiction of the Court;

18

d.  has been substantially diminished in value; or

e.  has been commingled with other property which cannot be subdivided

without difficulty;

it is the intent of the United States to seek forfeiture of any other property of the defendant

up to the value of the above-described forfeitable property, pursuant to 21 U.S.C. § 853(p).

A **TRUE BILL**, this _____28_____ day of November, 2023.

*/s/ Foreperson*
FOREPERSON

F/R Zachary T. Lee
United States Attorney
Acting under authority conferred by 28 U.S.C. § 515